

IN THE UNITED STATES COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| SECURITIES AND<br>EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:10-cv-667   (LMB/TRJ) |
| | ) | |
| LEE B. FARKAS | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

BRIEF IN SUPPORT OF DEFENDANT'S
MOTION IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

Taylor, Bean & Whitaker Mortgage Corp. (TBW") based in Ocala, Florida was founded in
1982 and was one of the largest privately held mortgage lending companies
in the United States.  TBW was principally involved in the origination, purchase
and sale, and servicing of residential mortgage loans.  TBW generally sold
these loans in the secondary market to third party investors, including Federal
Home Loan Mortgage Corporation (Freddie Mac) and commercial financial institutions,
either individually, or part of mortgage backed securities that received guarantees
by Freddie Mac or the Government National Mortgage Association (GNMA).  TBW
originated and purchased billions of dollars in new residential loans on an
annual basis.  To find its mortgage loan origination and acquisition business,
TBW relied on various purchase facilities, credit lines and financing vehicles
primarily with Colonial Bank. (U.S. v. Lee B. Farkas  Criminal No. 1:10cr200
(E.D. Va) (Indictment I.A.1.)

On June 15, 2010, a Federal Grand Jury in the Eastern District of Virginia,
indicted Lee B. Farkas on one count of conspiring to commit wire, bank and
securities fraud, six counts of bank fraud, six counts of wire fraud and three
counts of securities fraud.  Two counts of wire fraud were dismissed before
the trial.  On April 19, 2011, following a 9 day trial, a jury convicted him

on all remaining counts.  On June 30, 2011, the court entered judgment on
the verdict.  Defendant appealed his conviction to the United States Court
of Appeals for the Fourth Circuit, which upheld the conviction.  Defendant
is serving a 360 month sentence at Butner Federal Correctional Institution
in Butner, NC.

The day after defendant's indictment, June 16, 2010, the SEC filed this civil
action seeking injunctive relief, an officer and director bar, disgorgment,
prejudgment interest and civil penalties.  Although the SEC's complaint is
related to the grand jury indictment, there exists genuine issues as to material
facts not fully and fairly litigated in the criminal trial.

Indeed, TBW, like most mortgage lenders, didn't have sufficient capital to
internally fund the mortgage loans it originated.  It then relied on various
financing arrangements, primarily with Colonial Bank.

One of the facilities, referred to as "COLB" was an arrangement where Colonial
purchased a 99% interest in certain whole loans, some originated by TBW and
some purchased from other originators.  The COLB facility was designed such
that Colonial would recoup its outlay only after TBW resold a mortgage
loan to a third party investor, which GENERALLY WAS SUPPOSED TO TAKE PLACE
WITHIN 90 DAYS AFTER BEING PLACED ON THE COLB FACILITY. (Indictment Pp 18).
It didn't require that the loan be sold, and didn't constitute the sale of
a security, but rather participation in whole loans.

One of the several other facilities that Colonial provided to TBW was nick-
named the "AOT" line, because Colonial's counsel, who authored the document,
named it thusly.  These participation agreements were specifically "pools
of loans, which were referred to as 'Trades' that were in the process of being
securitized and/or sold to third-party investors." (Indictment Pp 22)  The
whole loan participations were "to provide TBW with immediate liquidity while
TBW sought to finalize sales of pools of loans backing the Trades..."
(Indictment Pp 23).  The indictment clearly states that Colonial Bank was
financing loans, not securities under the Securities Act of 1933 (Securities Act)

-2-

[15 USC §77 et. seq.] or the Securities Act of 1934 (Exchange Act) [15 USC §78 et. seq.]. As was the case of J. Henry Schroder Bank & Trust Co. v. Metropolitan Savings Bank (1986 1st Dept) 117 App Div 2d 515,497 NYSd 931, "No cause of action existed for violation of federal securities laws because loan participation agreement was neither security nor investment, but was transfer of interest in mortgage obligation."

Plaintiff SEC misquotes the indictment in its brief when it states "...when Colonial purchased a trade from TBW..." The indictment clearly states that the facility was for "...the purchase of pools of loans," (Indictment Pp22). Mortgage loans are not securities, nor are pools of loans, regardless of how Colonial Bank or Colonial BancGroup in its sole discretion, reports assets on its SEC filings. Testimony at trial confirmed the Defendant had never seen Colonial's SEC filings.

Clearly, the mortgage loans, labeled plan "B" in the indictment were not Securities, and "crap loans" are whole loans, not securities.

The jury in the criminal trial never established how much of this "$1.6 Billion on BancGroup's financial statements failed to contain underlying collateral to either support the values entered into Colonial's accounting system by the MWLD or to be capable of being sold to other Agencies or any third –party" because when defense counsel attempted to cross examine witnesses as to the extent of the fraud and/or economic loss, the Court interrupted "it is irrelevant to this case as to whether there is a $50 million or a $5 billion hole...you can have a fraud without a big loss." (R. 228 Transcript of Jury Trial Vol 7 (pm) [1899–1900]).

Defendant Farkas also signed confirmations of amounts TBW had outstanding under the various financing agreements with Colonial Bank. In those confirmations, TBW confirmed outstanding amounts under the various financing arrangements. The confirmed amounts were accurate.

The SEC's brief states that there was a connection between Colonial BancGroup's stock movement and Colonial Bank's conditional TARP approval from the Treasury

-3-

Department.  The brief further would lead one to make a connection between
the price increase in BancGroup's share price and the Defendant, who owned
no stock in BancGroup, nor had yet been approached by BancGroup's senior management
to assist in raising capital for BancGroup.  If Colonial failed to disclose
that it needed to raise $300 million in additional capital, Defendant was
unaware of it at that time. Colonial BancGroup was literally begging Defendant
to help with the capital raise.  The indictment says nothing of Defendants
approaching BancGroup with an offer to organize an investment group, when,
in fact, the exact opposite was true.

The SEC brief attempts to twist facts in the indictment regarding Ocala Funding,
which was, indeed a wholly-owned subsidiary of TBW.  It never raised capital
as the SEC brief says. The only capital in Ocala Funding belonged to TBW.
There were no investors in Ocala Funding other than TBW.

Rule 56, Summary Judgment:

> (a) Motion for Summary Judgment or Pratial Summary Judgment.  A
> party may move for summary judgment, identifying each claim or defense
> − or the part of each claim or defense−on which summary judgment
> is sought.  The court shall grant summary judgment if the movant
> shows that there is no genuine dispute as to any material fact and
> the movant is entitled to judgment as a matter of law.  The court
> should state on the record the reasons for granting or denying the
> motion.

In the Securities and Exchange Commission v. Michael Resnick and Mark Kaiser
(604 F. Supp 2d 773, 2009  Fourth District) it was ruled:

> "A party opposing a properly supported motion for summary judgment
> 'may not rest upon the mere allegations or denials of [his] pleadings,'
> but rather must 'set forth specific facts showing that there is
> a genuine issue for trial'" (Bouchat v. Baltimore Ravens Football
> Club, Inc., 346 F.3d 514, 525 (4th Cir. 2003)) (alteration in original)
> (quoting Fed. R. Civ. P 56(e)).  The court must "view the evidence
> in light most favorable to...the nonmovant, and draw all reasonable

-4-

inferences in her favor without weighing the evidence or assessing
the witness' credibility." Dennis v. Columbia Colleton Med. Ctr.,
290 F.3d 639, 644-45 (4th Cir 2002), but the court also must abide
by the affirmative obligation of the trial judge to prevent factually
unsupported claims and defenses from proceeding to trial..."

As ruled, also in the case of Sensormatic Security Corporation v. Sensormatic
Electronics Corporation, et al, (455 F. Supp. 2d 399, 4th Dist), It is well
established that a motion for summary judgment will be granted only if there
exists no genuine issue as to any material fact and the moving party is entitled
to judgment as a matter of law. the moving party bears the burden of showing
that there is no genuine issue as to any material fact that he or she is entitled
to judgment as a matter of law. When ruling on a motion for summary judgment,
the court must construe the facts alleged in the light most favorable to the
party opposing the motion. A party that bears the burden of proof on a particular
claim must factually support each element of its claim. A complete failure
of proof concerning an essential element necessarily renders all other facts
immaterial. Summary judgment will not be appropriate unless the movant's evidence
supporting the motion demonstrates an absence of genuine dispute as to every
fact material to each element of the movant's claim and the non-movant's response
fails to raise a genuine issue of material fact as to any one element.

In this case, the most important issues are yet to be ajudicated, namely,
did TBW's participation in the COLB and AOT programs constitute the sale of
secuirities under 15 USCS §§77a et. seq.?

The term security is defined in the code as:

"(1) The term "Security" means any note, stock, treasury stock,
security future, security-based swap, bond, debenture, evidence
of indebtedness, certificate of interest or participation in any
profit sharing agreement, collateral-trust certificate, preorganization
certificate or subscription, transferable share, investment contract
voting-trust certificate, certificate of deposit for a security,

-5-

fractional undivided interest in oil, gas or other mineral rights,
any put, call straddle, option, or privilige entered into on a national
securities exchange relating to foreign currency, or in general
any interest or instrument commonly known as a "security" or any
certificate of interest or participation in, temporary or interim
certificate for, receipt for, guarantee of, or warrant or right
to subscribe to or purchase any of the foregoing."

In the case of Thomas A. Orman and Leslie E. Esposito v. Mortgage IT (Civil
No. 11-3196, 2012 Third Dist.), "Securitization of a loan is a form of structured
finance in which pools of loans are packaged and sold to an independent entity
that raises money to finance such purchase[s] by issuing notes or other securities
backed by the pool of loans..."

The assets that were the subject of the indictment were mortgage loans, or
pools of mortgage loans (Indictment Pp 14,17,18,19,20,21,22,23,24,25,26,27,28,29,34,
36,37,51B, 51C, 51D). The indictment defines "Trades" as "interests in pools
of loans." (Pp22). The aforementioned definition of a security would not
include mortgage loans, or participation interests in mortgage loans or pools
of mortgage loans, remembering the Supreme Court ruling in J. Henry Schrader
that "...loan participation agreement was neither security nor investment...".
it is impossible that the transactions described in the indictment were violations
of securities laws.

The next most important issue yet to be ajudicated in this case is whether
the transactions described therein, involving Colonial Bank and TBW, whether
it be the COLB facility or the AOT facilty, were material and could constitute
a violation under Securities Act of 1933 or the Securities Exchange Act of
1934.

Materiality is defined in accounting terms by Accounting-Simplified.com, as

Information is material if its ommission or misstatement could
indluence the economic decisions of users taken on the basis of
the financial statements (IASB Framework)
Materiality therefore relates to the significance of transactions,
balances and errors contained in the financial statements. Materiality

defines the threshold or cutoff point after which financial information
becomes relevant to the decision making needs of the users.  Information
contained in the financial statements must therefore be complete in  all
material respects in order for them to present a true and fair view of
the affairs of the entity.  Materiality is relative to the size and par-
ticular circumstances of individual companies.
EXAMPLE - Size
A default by a customer who owes only $1000 to a company having net assets
of worth $10 million is immaterial to the financial statements of the
company.
However, if the amount of default was, say $2 million, the information
would have been material to the financial statements omission of which
could cause users to make incorrect business decisions.

In the trial, the jury was not allowed to determine materiality or hear evidence
from the Defendant to help them make that decision. The Judge short stopped
every effort from the Defendant to present testimony that there was sufficient
collateral and security for Colonial Bank to support its financing of TBW's loans.
Further, although trial court recognized potential relevance as to forfeiture,
it nonetheless did not wish to "waste the Jury's time." (R 228 transcript of
Jury Trial Vol 7 (pm) [1900]; J.A. 1695).  The trial court also foreclosed defense
efforts to obtain testimony from Mr. Luria which would "fill the hole" i.e. to
show the government's figures as to be highly exaggerated.  The Court interrupted
cross examination to opine that "it is completely irrelevant to this case as
to whether there is a $50 million or $5 billion hole...you can have fraud without
a big loss."  (R. 228 Transcript of Jury Trial Vol 7 (pm) [1899-1900]; J.A. 1694-
95).  You might be able to "have fraud without a big loss", but you can't have
Securities fraud without a MATERIAL loss.

The fact that Colonial BancGroup was a publicly traded company, whose shares
were registered with the SEC pursuant to Section 12(g) of the Exchange Act (Indict-
ment Pp 5) does not make transactions between Colonial Bank and TBW securities
transactions.  It would not even "coincide" with a securities transaction.  In
fact, that Colonial BancGroup was publicly traded had nothing whatsoever to do

-7-

with transactions with Colonial Bank's mortgage lending operation.

The doctrine of collateral estoppel is not applicable in this case.  The 4th
Circuit has held that for collateral estoppel to apply, the party asserting it
must establish that:

> (1)  the issue sought to be precluded is identical to one previously liti-
> gated; (2) the issue must have been actually determined in the prior
> proceeding; (3) determinatin of the issue must have been a critical and
> necessary part of the decision in the prior proceeding; (4) the prior
> judgment must be final and valid; and (5) the party against whom estoppel
> is asserted must have had a full and fair opportunity to litigate the
> issue in the previous forum. (Sedlock v. Braswell Services Group, Inc.
> 134 F.3d 224 (4th Cir. 1998)

SEC v. Resnick states:

> For purposes of collateral estoppel, however, the key is the objective
> fullness and fairness (604 F. Supp. 2d 780) of the opportunity to litigate.
> Where non-moving party has had no opportunity to litigate particular
> issues, then  collateral estoppel may not apply to them.

> Conversely, where the non-moving party had the incentive to litigate
> vigorously in the prior proceeding, and was able in that proceeding
> to examine the evidence against him, present his own evidence, cross-
> examine witnesses, be represented by competent counsel, and otherwise
> enjoy the protections of due process as relates to the issue under dis-
> pute, he will generally be considered to have had a full and fair op-
> portunity to litigate that issue for purposes of collateral estoppel.
> See Parkline Hosiery, 439 U.S. at 332-23 (finding the non-moving party
> to have had a full and fair opportunity to litigate, where in the previous
> proceeding, he had "every incentive to litigate...fully and vigorously"
> and had enjoyed all the "procedural opportunities" that would be available
> to him in the second proceeding); Blackwell, 477 F.Supp 2d at 901-902...
> This determination is not to be made lightly, however, and should be based
> on the specific facts and equities of the case at hand...

Unlike in "Sedlock", the issue sought to be precluded is not identical to one previously litigated.

Here, Plaintiff, SEC, alleges that Defendant's conduct involving TBW constituted violation of the anti-fraud provisions of the federal securities laws, specifically Section 17(a) of the Securities Act, Section 10(L) of the Exchange Act and Exchange Act Rule 10b-5. The Indictment clearly states that Colonail Bank was financing mortgage loans and not securities. (Indictment Pp 14, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 34, 36, 37, 51B, 51C, 51D). The Supreme Court ruled that "No cause of action existed for the violation of federal securities law because loan participation agreement was neither security nor investment, but transfer of interest in mortgage obligation." (J. Henry Schroder Bank v. Metropolitan Savings Bank).

"Widespread misconduct" does not constitute securities fraud, which must involve securities, not mortgage loans or pools of mortgage loans.

Section 17(a) of the Securities Act provides "(a) it shall be unlawful for any person in the offer or sale of any securities (including security-based swaps)..." Therefore 17(a) does not apply here.

Section 10(b) of the Exchange Act similarly only applies to securities.

Finally, Rule 10b-5 also only refers to purchase or sale of securities. The Supreme Court opined that:

> (1) For Rule 10b-5 purposes, the maker of a statement is the person with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" statement in its own right. This rule follows from Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 180, 114 S. Ct. 1439, 128 L. Ed. 2d 119, which held that Rule 10b-5's right of action does not include suits against aiders and abettors who contribute "substantial assistance" to the making of a statement but do not actually make it. Reading "make" more broadly to include persons or entities lacking ultimate control over a statement,

-9-

would substantially undermine Central Bank by rendering aiders and abbet-
tors almost nonexistent. The court's interpretation is also suggested
by Stoneridge, 552 U.S. at 161, 128 S. Ct. 761, 169 L. Ed. 2d 627, and
accords with the narrow scope that must be given the implied private
right of action, id at 176. Pp. — - - --, 180 L. Ed., at 175-176. (180
LED 166, _u.S._ Janus Capital Group, Inc. v. First Derivative Traders
6/13/2011).

Further,

(9) For purposes of Rule 10b-5, the maker of a statement is the person
or entity with ultimate authority over the statement, including its
content and whether and how to communicate it. Without control, a person
or entity can merely suggest what to say, not make a statement in its
own right. One who prepares or publishes a statement on behalf of another
is not its maker. And in the ordinary course, attribution within a state-
ment or implicit from surrounding circumstances is strong evidence that
a statement was made by-and only by-the party to whom it is attributed.
This rule might best be exemplified by the relationship between a speech-
writer and a speaker. Even when a speechwriter drafts a speech, the
content is entirely within the control of the person who delivers it.
And it is the speaker who takes credit-or blame-for what is ultimately
said.
The majority finds the complaint fatally flawed, however, because (1)
Rule 10b-5 says that no "person" shall "directly or indirectly...make
any statement of a MATERIAL fact,..."

Luminent Mortgage Capital Inc. v. Merrill Lynch & Co. in the US District Court,
Third District (652 F. Supp 2d 576 Civil action No. 07-5423  8/20/2009), which
is a case about real mortgage securities, established that "To establish a
claim for violation of Rule 10b-5, plaintiffs must allege (1) a material misrep-
representation or omission by defendants; (2) scienter; (3) a connection between
the misrepresentation or omission and the purchase or sale of a security;
(4) reliance upon the misrepresentation or omission; (5) economic loss and
(6) loss causation.

-10-

The SEC's brief correctly states "...left to determine is whether the misconduct described in the indictment involved a 'security' so as to bring federal securities laws into play." The indictment, however, says "NO" as previously noted. (Indictment Pp 14, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 34, 36, 29, 37, 51B, 51C, 51D). Each reference is to mortgages, pools or "trades" which are defined in the indictment as "interests in pools of loans" (Indictment Pp 22).

Mortgage backed securities are the rsult of financial innovations of the 1990's, which saw the advantage of turning traditional mortgage loans into asset securitizations. In asset securitization, originators sell mortgages to third-party financial institutions. By selling themortgages, the originators receive fees in connectin with the issuance of the loan, secure up-front proceeds upon selling the loan into the secondary market, and eliminate any risk they might carry associated with borrower defaults. The financial institutions then securitize those loans by pooling them together, depositing them into a trust, and selling interests in the trusts to investors in the form of MBS. (pension Trust Fund for Operating Engineers vs. Mortgage Asset Security Transactions Civil Action 10-898, 3rd District, 2012) (explaining the nature of mortgage backed securities)

In this case, Colonial Bank was financing the pools of loans which were, at some point in the future to be sold as whole loans or securitized by someone else.

The SEC brief explains that Freddie Mac was in the business of "securitizing" mortgages and purchased mortgages and mortgage backed securities for its own mortgage-related investment portfolios. This fact has no relevance to whether transactions between TBW and Colonial involved securities.

The fact that Colonial recorded the trades as "Securities Purchased Under Agreements to Resell" is also irrelevant to this case. Defendant had no control, or even input into how Colonial Bank or BancGroup kept records. Please refer once again to the Supreme Court's decision in Janus Capital Group, Inc., "The rule might best be exemplified by the relationship between a sheechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within

-11-

control of the person who delivers it. And, it is the speaker who takes credit-or-blame for what is ultimately said." Here Defendant didn't write the speech, never heard the speech and knew nothing of its content.

Although the Jury did produce a guilty verdict on Counts 14, 15, and 16, still the doctrine of collateral estoppel is not applicable here.  "Whenever the non-moving party has had no opportunity to litigate particular issues then collateral estoppel may not apply to them... Likewise, where the opportunity to litigate was impeded by adjudicative procedures that were cursory, poor in quality, or otherwise unfair, then collateral estoppel ought not to apply." (SEC v. Resnick).

USA v. Leon Wight (Court of Appeals for the 4th Circuit, 839 F.2d 193, 1987 US Lexis 6827 No. 86-3070) is incredibly instructive here. The Appeals court found:

> "In Wight's case, however, the application of collateral estoppel does
> not extend beyond the determination of liability. We reject the government's
> position, which the district court apparently adopted, that (839 F.2d
> 196) Wight is collaterally estopped from challenging the amount of the
> damage award because he pleaded guilty to criminal information  We reach
> this conculsion because the specific damage award was not included as
> an essential part of Wight's plea agreement."

In this case, the same is true. The amount of the alleged fraud was not litigated in the criminal trial, therefore the materiality of the fraud can not be determined. The Defendant should be allowed to litigate the amount of the alleged misconduct, which is an essential element in this case.

For these reasons, the conclusion the Plaintiff, SEC, reaches in its brief that the fraud issues in the criminal case were indeed identical to those in the civil enforcement action is not true.  Mis-quoting the indictment to attempt to make allegations in the Indictment appear as securities related does not make it so.

In order for collateral estoppel to apply, the party against whom estoppel was

-12-

asserted mush have had a full and fair opportunity to litigate the issue in
the previous forum.  Although defendant had every incentive to litigate fully
and vigorously, he was not allowed to present evidence of materiality of the
amounts of the alleged securities fraud, and the Jury never decided the issue
of materiality.  Materiality should be decided by a jury.

In Pine State Creamery Co. v. Land-O-Sun Dairies (No 5:96 cv 170 bo 1997,4th
Dist) it is made very clear that materiality was an issue for the jury.  The
issue before the court there was not whether the "deviation of the September
and October financials was 'material'; this issue would be one for the jury."

Here, as there, the materiality of the alleged misrepresentation which "caused
Colonial BancGroup to file with the SEC materially false annual reports contained
in Form 10-K and Quarterly reports contained in Form 10-Q that misstated the
value and nature of assets by Colonial BancGRoup." (SEC brief p.18) is the
deciding factor as to whether there was, in fact, a violation of U.S. Securities
laws.

"For purposes of collateral estoppel, however, the key is the objective fullness
and fairness...of the opportunity to litigate.  Where non-moving party has
had no opportunity to litigate particular issues, then collateral estoppel
may not apply to them" (SEC v. Resnick).  Here, defendant had no opportunity
to litigate the size of the alleged fraud nor did the jury have any opportunity
to establish it.

SEC v. Linda Woolf, et al (835 F. Supp 2d 111, 4th Dist, 1:08 cv 235) guides
us as to whether a transaction touches on or coincides with a securities transaction:

    "(1) Whether a securities sale was necessary to the completion of the
    fraudulent scheme; (2) whether the parties relationship was such that
    it would necessarily involve trading in securities; (3) whether the
    defendant intended to induce a securities transaction; and (4) whether
    material misrepresentations were disseminated to the public in a medium
    upon which a reasonable investor would rely.  The Fourth Circuit explained
    that these factors are not mandatory requirements that a fraud must satisfy

                                    -13-

in order to meet § 10(b)'s in connection with requirement but rather
they exist merely to guide the inquiry."

Here, the only factor possibly satisfied by Counts 14, 15 and 16 of the Indictment
is "(4) whether material misrepresentations were disseminated to the public..."
Again, without a determination of the amount of the alleged fraud, and therefore
its materiality, that factor can't possibly be satisfied.  So, none of the factors
established as a guide to the inquiry are met.

Defendant had no knowledge of Colonial BancGroup's reporting responsibilities, nor
was he directly or indirectly involved with Colonial BancGroup in compiling their
required reports.  Section 13(a) requires Colonial BancGroup to fill out certain
reports according to the SEC brief.

As addressed earlier in this brief, in the case of Janus Capital Group, collateral
estoppel is not applicable here.

Defendant was not knowledgeable of Colonial's record keeping requirements or proceed-
ures.  He was not directly or indirectly involved, nor did he have any input into
the records ofColonial Bank or Colonial BancGroup.  Defendant can't be held liable
for record keeping at Colonial BancGroup, as opined by the Supreme Court in the
Janus Capital Group, Inc. case previously cited.

For the foregoing reasons, defendant asks the court to deny the plaintiff's motion
for summary judgment against defendant and allow defendant to fully litigate these
issues as provided by the standard of due process guaranteed by the US Constitution
and its Bill of Rights.

Respectfully submitted this ___14___ day of March, 2013.

Lee B. Farkas
43560-018
FCI 2
PO Box 1500
Butner, NC  27509

LEE FARKAS 43560-018
FCI 2
P O BOX 1500
BUTNER, NC 27509

720
16
73.6



US Marshals Service

FEDERAL CORRECTIONAL INSTITUTION II
BUTNER, NC 27509-1500

Date 2-15-13

The enclosed letter was processed through special mailing
procedures for forwarding to you. The letter has been neither
opened nor inspected. If the writer raises a question or prob-
lem over which this facility has jurisdiction, you may wish to
return the material for further information or clarification.
If the writer encloses correspondence for forwarding to another
............ you return the enclosure to the above address.

LEGAL
MAIL

CERTIFIED MAIL



7012 3050 0001 9688 3197

⇨43560-018⇦
Clerk Of Court
401 Courthouse SQ
Albert Bryan Courthouse
Alexandria, VA 22314
United States